UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| COPELAND LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CASE NO: 4:24CV509-HEA |
| | ) | |
| DOUG THURSTON and | ) | |
| DELTATRAK, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Plaintiff's Motion for Temporary

Restraining Order against Defendants, [Doc. No. 5]. Defendants did not file written

oppositions to the motion but appeared and argued at the hearing held on April 15,

2024.  The Court has considered the arguments and has reviewed Plaintiff's

Verified Complaint and all exhibits thereto, the Motion for Temporary Restraining

Order, the Memorandum in Support of Motion for Temporary Restraining Order.

For the reasons set forth below, Plaintiff's Motion for Temporary Restraining

Order is hereby **GRANTED**.

The following factual background is taken from the verified complaint and

the motion and supporting memorandum for temporary restraining order:

Copeland is a global provider of sustainable climate solutions, combining

category-leading brands in compression, controls, software and monitoring for

heating, cooling, and refrigeration.  Until June 2023, Copeland was owned by and part of Emerson Electric Co. ("Emerson"), operating under the name Emerson Climate Technologies. On June 1, 2023, Emerson spun off its global climate control businesses as a standalone entity as Copeland, LP. Emerson maintained a 40% common equity ownership in Copeland.

Copeland has long been a global pioneer in the HVAC and refrigeration industries, providing climate technology solutions to customers around the world. Copeland's business includes cold chain management and temperature monitoring solutions. Its business is heavily reliant on its industrial technology and software and on its salesforce and customers. DeltaTrak, and its affiliates, are direct competitors of Copeland in the cold chain management and temperature monitoring solutions industry. Like Copeland, DeltaTrak operates in the same geographic location and pursues the same clients as Copeland pursues.

Prior to the summer of 2016, Thurston was a shareholder for PakSense, Inc., which was a company specializing in products for monitoring the quality and safety of food, pharmaceuticals, and other environmentally sensitive items during cold chain transport and distribution. In 2016, Emerson acquired PakSense (which was merged into and renamed Copeland Cold Chain LP). As part of the purchase, Thurston received a substantial payout as a shareholder of PakSense, Inc. In addition, Emerson hired Thurston, who at the time was employed as the Vice

President of Sales – Food for PakSense, Inc., to work for Emerson in the same capacity.

On July 1, 2016, Thurston entered into an Employment Agreement and a Cash Bonus Plan Award Agreement (the "Employment Agreement"). The agreement contained non-compete, confidentiality, and assignment of work product provisions. As part of that agreement, Thurston received significant compensation, including options in Emerson stock, a salary, participation in the commission plan and cash bonus payment of nearly a quarter of million dollars paid over four years. In exchange for the consideration above, Thurston agreed to the following non-complete agreement:

> You agree that during your employment with the Company and for a period of two years after the date of termination of your services, you will not (1) compete directly or indirectly in any capacity with the Company's business as currently conducted and as that business may evolve in the ordinary course during your employment, or compete with any other business of the Company or its affiliates with which you become familiar during your employment anywhere in the world where the Company or any of such affiliates conduct such business, (2) hire, or assist anyone else to hire, any employee of the Company, or any of the Company's subsidiaries or affiliates, or seek to persuade, or assist anyone else to seek to persuade, any such employee of the Company, or any of the Company's subsidiaries or affiliates, to discontinue employment with the Company, its subsidiaries or affiliates, or (3) induce or attempt to induce, or assist anyone else to induce or attempt to induce, any customer of the Company (or any of its subsidiaries or affiliates) to reduce or discontinue its business with the Company (or any of its subsidiaries or affiliates) or disclose to anyone else the name and/or requirements of any such customer.

By signing the Agreement, Thurston also agreed to the following confidentially provision:

> You also agree that you will not use or reveal "Confidential Information" to anyone other than for and on behalf of the Company (or its subsidiaries or affiliates) unless legally compelled to do so during your employment with the Company and for so long thereafter as such information remains confidential. As used herein, "Confidential Information" shall include, but shall not be limited to, information, in whatever form kept or recorded, pertaining to: inventions, discoveries, know-how, ideas, computer programs, designs, algorithms, processes and structures, product information, research and development information, client information, financial information, business processes and methodology, and any other technical and business information of the Business, the Company or Emerson, or their subsidiaries and affiliates, which is of a confidential, trade secret and/or proprietary character. However, Confidential Information shall not include any information which is in the public domain. You understand that Confidential Information may or may not be labeled as "confidential" and you will treat all information as confidential unless otherwise informed by the Company.

The Employment Agreement provides that it shall be interpreted by the laws of Missouri and any litigation relating to the Employment Agreement shall be filed and pursued exclusively in the federal or state courts in St. Louis County, Missouri.

Although the legal entity by whom Defendant Thurston was employed changed several times during his employment, Thurston always worked as the Vice President of Sales in the food division. In this position, Thurston oversaw sales activities, met with major customers, drew up sales reports, designed new and effective sales strategies, and worked to market and promote Copeland's products in the United States. He developed substantial relationships with Copeland's

customers. In November, 2023, Copeland notified Thurston that his position with Copeland was being eliminated as part of its cold chain business restructure in response to the current business conditions, effective November 14, 2023. On December 1, 2023, Copeland and Thurston entered into a Severance Agreement, Waiver and General Release (the "Severance Agreement"). The Severance Agreement reminded Thurston that his post-employment covenants would remain in effect. Copeland paid Thurston $64,076.09 in exchange for signing a general waiver and release.

In February 2024, Thurston began working as the Vice President of Sales for U.S. Development for DeltaTrak. Thurston is now working for a direct competitor of Copeland in a similar executive role to that which he performed for Copeland and operating in competition against Copeland. Plaintiff avers Thurston is actively soliciting clients and employees of Copeland for the benefit of DeltaTrak. Two employees have already resigned from Copeland, with one of those employees specifically stating he is going to work for or with Thurston at DeltaTrak. Thurston is in a position to use confidential information to compete against Copeland and to assist DeltaTrak in developing a competitive edge over Copeland.

## Legal Standard

In considering whether to grant a TRO or preliminary injunction, the Court looks to four primary factors: (1) the likelihood of the moving party's success on

the merits; (2) the threat of irreparable harm to the moving party; (3) the state of balance between the alleged irreparable harm and the harm that granting the injunction would inflict on the other party; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc*., 640 F.2d 109, 113 (8th Cir. 1981); . *see also Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013). This analysis was designed to determine whether the Court should intervene to preserve the status quo until it decides the merits of the case. *Dataphase*, 640 F.2d at 109. The factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. *West Pub. Co. v. Mead Data Cent., Inc*., 799 F.2d 1219, 1222 (8th Cir. 1986). The burden of establishing the propriety of a TRO is on the movant. *Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

**Likelihood of Success on the Merits**

The Court's jurisdiction is based on diversity of citizenship under 28 U.S.C. §1332. As such, Missouri substantive law applies to this case. Under Missouri law, non-compete covenants are enforced if they are reasonable under the circumstances and their enforcement serves legitimate protectable interests. *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893, 908 (8th Cir. 2010).

> Missouri courts will enforce noncompete agreements that are "demonstratively reasonable." *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841 (Mo. banc 2012). A demonstratively reasonable noncompete agreement "must be narrowly tailored temporally and geographically and

6

must seek to protect legitimate employer interests beyond mere competition by a former employee." *Id*. at 841-42. "Accordingly, a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.' " *Id*. at 842 (quoting *Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. banc 2006)). "The employer has the burden to prove that the non-compete agreement protects its legitimate interests in trade secrets or customer contacts and that the agreement is reasonable as to time and geographic space." *Id*.

\*      \*      \*      \*      \*      \*      \*

"An employer has a legitimate interest in customer contacts to the extent it seeks to protect against 'the influence an employee acquires over his employer's customers through personal contact.' " *Id*. (quoting *Copeland*, 198 S.W.3d at 611). A customer is defined as "one who repeatedly has business dealings with a particular tradesman or business." *Id*. (quoting *Silvers, Asher, Sher & McLaren, M.D.s Neurology, P.C. v. Batchu*, 16 S.W.3d 340, 345 (Mo. App. 2000)). "Customer contacts are a protectable commodity because goodwill develops between the customers and the employer through its employees whose job it is to meet and converse with the customer while representing the employer." *Brown v. Rollet Bros. Trucking Co.*, 291 S.W.3d 766, 774 (Mo. App. 2009) (citation omitted). As this court explained:

> The goodwill that develops from customer contacts between the salesman or business partner and the company's customer is essential to the compan[y's] success and is the reason the employee or the business partner is remunerated. The goodwill that develops results in sales of the company's product or services. Therefore, an employer has a protectable right in both customers and goodwill.

*AEE-EMF, Inc. v. Passmore*, 906 S.W.2d 714, 720 (Mo. App. 1995).

"The purpose of a non-compete agreement is 'to keep the covenanting employee out of a situation in which he might be able to make use of contacts with customers to his former employer's disadvantage.' " *Copeland*, 198 S.W.3d at 611 (quoting *Osage Glass v. Donovan*, 693 S.W.2d 71, 75 (Mo. banc 1985)). "[A]n employee's ability to influence customers depends on the 'quality, frequency, and duration of an employee's exposure to an

employer's customers, which is crucial in determining the covenant's reasonableness.' " *Kennebrew*, 379 S.W.3d at 842 (quoting *Copeland,* 198 S.W.3d at 611). The former employee's position with the employer is also relevant to this determination. *Id*.

*Jefferson City Med. Grp., P.C. v. Brummett*, No. WD 86589, 2024 WL 1517680, at *5–6 (Mo. Ct. App. Apr. 9, 2024).

The Court is satisfied that Plaintiff is likely to succeed on the merits of its request for enforcement of the Agreement, as well as its request for injunctive relief.

With respect to scope, the Agreement is reasonable under the circumstances because the business in which both Plaintiff and Defendant engage involves a limited category of customers around the world. The industry is a special niche of a finite number of purchasers of Plaintiff's goods and services, but those customers are located anywhere in the world. Thus, in order for the agreement to have meaning, it must encompass the globe. Indeed, Defendant challenged neither the scope nor 2-year term. Rather, Defendant challenged the validity of the Agreement itself arguing that since PakSense, Inc., "the company" in the Agreement, no longer exists, the Agreement likewise no longer exists.  The flaw in this argument, however, is that the Agreement was between *Emerson* and Defendant Thurston. That portion of Emerson in the climate control business has been separated and renamed Copeland, but it remains the same Emerson business.

8

Courts applying Missouri law also readily enforce geographical limitations that span the world. *See*, *e.g.*, *Sigma Chemical Co. v. Harris*, 586 F. Supp. 704, 710 (E.D. Mo. 1984)(enforcing two-year, worldwide limitation); *Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239 (Mo. App. 1993) (enforcing a nationwide non-compete for five years).

Enforcing the Agreement also serves legitimate protectable interests of Plaintiff. An employer has a legitimate protectable interest in its confidential and trade secret information (including customer lists), its customer relationships, and the goodwill that developed while Defendant worked for Plaintiff. *Whelan Security Co. v. Kennebrew*, 379 S.W.3d 835 (Mo. 2012). The Missouri Supreme Court has recognized the employer's legitimate interest in customer contacts to "protect against 'the influence an employee acquires over his employer's customers through personal contact.'" *Kennebrew*, 379 S.W.3d at 842 (*quoting Healthcare Servs. of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 611 (Mo. 2006)). As such, customer non-solicitation provisions in relation to customers whom the employee dealt with, such as the provision in the Agreement, are reasonable to protect the employer's interests and, as such, enforceable. *Whelan*, 379 S.W.3d at 844-45. For example, in *Mid-States Paint & Chemical Co. v. Herr,* 746 S.W.2d 613, 618 (Mo. App. 1988), the court affirmed the lower court's holding that access to customer lists, pricing

information, and formula books warranted enforcement of a restrictive covenant for period of three years.

Likewise, in *Cape Mobile Home Mart, Inc. v. Mobley*, 780 S.W.2d 116, 117-19 (Mo. App. 1989), the court affirmed the lower court's finding that a restrictive covenant was enforceable where an employee possessed access to monthly and year-to-date sales and profit statistics, quarterly business and sales reports, a companywide operations and procedures manual listing employer policies and procedures, as well as customer lists. The court also noted that the employer advised employee that he would have access to a great deal of confidential information that he could not share.

These are precisely the protected pieces of vital information Thurston has which will significantly impact Plaintiff if the Agreement is not enforced. Thurston has information regarding strategies, contract expirations, new innovations, and new technologies. The restriction supports Plaintiff's legitimate business interests in protecting its confidential information and trade secrets, its goodwill, and its customer relationships.

If Defendant is permitted to continue to perform the competitive work at DeltaTrak, Inc. his use and disclosure of the information are inevitable. This is so because (1) the nature of his responsibilities at DeltaTrak are akin to those he held for Plaintiff and require his consideration of Plaintiff's confidential information in

the faithful performance of those responsibilities.  *See H&R Block Eastern Tax Services, Inc. v. Enchura*, 122 F. Supp. 2d 1067, 1074-75 (W.D. Mo. 2000).

Defendants argued that the FTC is going to ban noncompete agreements and thus Plaintiff's likelihood of success on the merits is extremely low. Indeed, Defendants' prediction of the ban has very recently occurred, (see https://www.ftc.gov/news-events/news/press-releases/2024/04/ftc-announces-rule-banning-noncompetes, last visited April 26, 2024. This ban, however, has no bearing on the matter before the Court since the substantive law of Missouri applies in this diversity of citizenship case.

**Irreparable Harm to Plaintiff Absent an Injunction**

"[T]o demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). This Court finds Plaintiff will suffer irreparable harm if the terms of the restrictive covenants are violated. "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002). "Courts generally hold that the disclosure of confidential information such as customer information and business strategy will result in irreparable harm to the plaintiff." *Experitec, Inv. v. Stachowski*, 2014 U.S. Dist. LEXIS 185282, at *7 (E.D. Mo. Jan. 30, 2014).

It is not necessary for the employer to show that actual damage has occurred in order to obtain injunctive relief. *Ashland Oil v. Tucker*, 768 S.W.2d 595, 601 (Mo. App. 1989); *Osage Glass, Inc. v. Donovan*, 693 S.W.2d 71, 75 (Mo. 1985). If the covenant is lawful, and the opportunity for influencing the employer's customers to the former employer's disadvantage, enforcement is appropriate. *Ashland Oil*, 768 S.W.2d at 601; *Osage Glass*, 693 S.W.2d at 75; *see also Systematic Business Services, Inc. v. Bratten*, 162 S.W.3d 41, 51 (Mo. Ct. App. 2005) (where the restrictive covenant is valid and the former employee has an opportunity to influence his former employer's customers, actual damages are not necessary to obtain permanent injunctive relief).

"The district court is empowered to issue an injunction 'even without a showing of past wrongs,' so long as 'there exists some cognizable danger of recurrent violation.'" *Church Mut. Ins. Co. v. Sands*, 2014 WL 3907831  *2 (W.D. Mo. Aug. 11, 2014) (quoting *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). A former employee's "possible disclosure or use of confidential information such as customer information" is relevant in determining irreparable harm. *Id.* (quoting *Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 569 (8th Cir. 1982)).

"The mere violation of a valid non-compete agreement can support an inference of the existence of a threat of irreparable harm." *Sands*, 2014 WL 3907831, at *3 (citing *N.I.S. Corp. v. Swindle*, 724 F.2d 707,710 (8th Cir. 1984)).

12

Irreparable harm is also properly presumed where there is evidence that a covenant not to compete is breached or confidential, proprietary information is being improperly used. *H&R Block Tax Servs. LLC v. Haworth*, 2015 WL 5601940 at * 3 (W.D. Mo. Sept. 22, 2015). As in *Haworth*, monetary relief will not adequately protect Plaintiff's interests in these relationships, and it cannot fully remedy Plaintiff's loss of goodwill, confidential information, and other legitimate business advantage. *Id.* at *4.

Plaintiff is subject to immediate and irreparable injury if Defendant is permitted to continue to solicit Plaintiff clients and offer competitive service on behalf of DeltaTrak. Defendant agreed in the agreements that any violation of the noncompete agreements constituted irreparable harm. Moreover, the agreements set forth the basis of this irreparable harm-maintaining the confidentiality of Plaintiff's information, trade secrets and using Plaintiff's goodwill in competition with Plaintiff:

> You also agree that you will not use or reveal "Confidential Information" to anyone other than for and on behalf of the Company (or its subsidiaries or affiliates) unless legally compelled to do so during your employment with the Company and for so long thereafter as such information remains confidential. As used herein, "Confidential Information" shall include, but shall not be limited to, information, in whatever form kept or recorded, pertaining to: inventions, discoveries, know-how, ideas, computer programs, designs, algorithms, processes and structures, product information, research and development information, client information, financial information, business processes and methodology, and any other technical and business information of the Business, the Company or Emerson, or their subsidiaries and affiliates, which is of a confidential, trade secret and/or proprietary

character. However, Confidential Information shall not include any information which is in the public domain. You understand that Confidential Information may or may not be labeled as "confidential" and you will treat all information as confidential unless otherwise informed by the Company.

The Court finds that in contrast to the irreparable harm that Plaintiff will suffer if injunctive relief is not granted, Defendant will suffer comparatively slight harm. Defendant will not be precluded from employment with Blue Yonder, rather he will be limited in the actions he takes.  Indeed, Plaintiff recognizes that not all of Defendant's duty are in direct competition with Plaintiff. Thus, the harm that Plaintiff may suffer absent an injunction, outweighs any harm that may befall Defendant if his actions are enjoined.

**Balance of Harms**

The Court finds that in contrast to the irreparable harm that Plaintiff will suffer if injunctive relief is not granted, Defendant will suffer comparatively slight harm. Thurston argued that he is a 62-year-old man and would have difficulty finding another job. Defendant will not be precluded from any sales employment and as Plaintiff argues, Thurston was given severance and a substantial monetary payment in exchange for his agreeing to the noncompete, which is not ordinarily associated with a noncompete agreement.

**The Public Interest**

Here, the balance of the equities also favors granting Plaintiff's motion for injunctive relief. Enjoining Defendant from violating the agreement will not harm the public. The public clearly has an interest in upholding valid contracts for which valuable consideration has been given and received. Thurston received the money for his covenant not to compete and he should be required to fulfill that obligation. Conversely, denying injunctive relief will cause Plaintiff irreparable harm, deny Plaintiff the benefit of its bargain with Defendant, and cost Plaintiff business and clients that it would not have lost but for the current situation.  Moreover, parties should be able to rely on each other to comply with their agreements and should be able to rely on the courts to enforce agreements when they are breached. The public interest thus weighs in favor of enjoining Defendant as requested by Plaintiff.

## CONCLUSION

Based upon the foregoing analysis, the Court concludes a temporary restraining order is appropriate.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for a temporary restraining order [Doc. No. 43] is **GRANTED**. Defendant Doug Thurston is hereby:

a. Enjoined from or performing any work, task, or other employment-related service on behalf of DeltaTrak in relation to the duties he performed at Plaintiff;

b. Enjoined from being employed by or performing any work, task or other employment-related service on behalf of any other competitor of Plaintiff in relation to the duties he performed at Plaintiff;

c. Enjoined from directly or indirectly contacting or soliciting any person or company that was a customer or had been solicited by Plaintiff as a potential customer of Plaintiff for a two-year period from the time his employment was terminated;

d. Enjoined from directly or indirectly contacting or soliciting any person that was any employee, contractor, or consultant of Plaintiff or any subsidiary at the time of Defendant's employment;

e. Enjoined from taking any action which might induce any business or person dealing with Plaintiff to cease dealing with Plaintiff, reduce its level of business with Plaintiff, or otherwise begin dealing with someone other than Plaintiff.

This Temporary Restraining Order shall expire on Thursday May 9, 2024 at 10:00 A.M., unless otherwise extended by this Court.

The hearing on Plaintiff's Motion for a Preliminary Injunction will be set for 2:15 P.M. on the 8th day of May, 2024.

16

Based upon the above discussion, the Court is of the opinion that no bond shall be required.

Dated this 29th day of April,  2024.


_____

HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE